**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**
OCT 19 2001
9:30-6:00
CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| BOYD BUSHMAN, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | NO. 4:01-CV-0498-A |
| LOCKHEED MARTIN CORPORATION | § § | |
| Defendant. | § | |

### FIRST AMENDED COMPLAINT

Plaintiff, Boyd Bushman, files this First Amended Complaint against Defendant, Lockheed Martin Corporation, as follows:

### 1. PARTIES

1.1. Plaintiff Boyd Bushman is a citizen of the State of Texas and may be served through his attorneys, the undersigned.

1.2. Defendant Lockheed Martin Corporation is incorporated under the laws of the State of Delaware, and is doing business in Tarrant County Texas at 1 Lockheed Blvd., Fort Worth Texas 76101. Service can be made of the Defendant by serving its registered agent, Corporation Service Co., 800 Brazos, Austin TX 78701.

### 2. VENUE AND JURISDICTION

2.1. The amount in controversy in this case is in excess of the minimum jurisdictional limits of this court. The Court has jurisdiction over the corporate Defendants who are doing business in Texas and reside in Fort Worth, Texas. The Court has jurisdiction over the individual Defendant, who is a Texas resident.

2.2. Venue is proper in Tarrant County because at least part of the causes of action arose in Tarrant County.



### 3. FACTS

**DEFENDANT BEGINS WORK IN THE MILITARY FIGHTER JET INDUSTRY.**

3.1. This case arises out of the employment of and contracts between Plaintiff Boyd Bushman ("Mr. Bushman") and Defendant, Lockheed Martin Corporation ("Lockheed'). Mr. Bushman began his career in the aviation industry in 1963 when he was originally employed as a scientist by Lockheed's predecessor, General Dynamics Corp.

3.2. General Dynamics was acquired by Lockheed in March 1993. It took over the facilities, operations and contracts of General Dynamics, and Mr. Bushman thereafter worked for Lockheed. Most recently, Mr. Bushman held the title of Senior Scientist at Lockheed's Fort Worth location.

3.3. Defendant's business has been related generally to government defense contracting. The Fort Worth location of Lockheed had been a bomber factory until the 1970s. At that point in time, Lockheed's business suffered due to the United States Department of Defense's ("DOD") issuance of contract specifications for less bombers and more fighter-planes.

3.4. Making the change from a bomber factory to a high-tech fighter-plane factory, Lockheed has relied upon technologies that were developed within the company. It was the use of certain inventions, many of which were created by Mr. Bushman, that allowed Lockheed to become competitive in the manufacturing and sale of military fighter-planes to the United States government. New inventions by Mr. Bushman, incorporated into each new generation of the aircraft, have continued to provide Lockheed with the ability to sell more planes and gain development monies from the DOD.

**LOCKHEED ENTICES MR. BUSHMAN TO ACCEPT EMPLOYMENT BY OFFERING INVENTION AGREEMENTS**

4.1. In 1986, the Fort Worth division of then General Dynamics asked Mr. Bushman to consider employment in its Special Projects division. At the time of Mr. Bushman's initial interview,

General Dynamics offered Mr. Bushman an agreement entitled "Invention Agreements." This was a direct inducement to Mr. Bushman to accept employment.

4.2. The "Invention Agreements" are comprised of three parts, (1) Invention Agreement, (2) Agreement Relating to Atomic Energy Work, and (3) Property Rights in Inventions Under Contracts with the National Aeronautics and Space Administration. Importantly, the Invention Agreements "inure[d] to the benefit of General Dynamic's successors and assigns." So the agreement still exists between Mr. Bushman and Lockheed.

4.3. The Invention Agreement controls the property rights of the parties regarding Mr. Bushman's "inventions and improvements made, developed, perfected, devised, or conceived by [Mr. Bushman] . . . relating to the business, developments, products, or activities of [Lockheed], or its subsidiaries . . . ." In the Invention Agreement does no require that all of Mr. Bushman's inventions be submitted for patent.

### LOCKHEED PROMISES TO PAY EXTRA COMPENSATION TO MR. BUSHMAN FOR PATENTING HIS INVENTIONS AND PROMISES INCOME SHARING FOR ANY *"SALE OF RIGHTS"* IN HIS INVENTIONS

4.4. The agreement also calls for certain "cash awards" to be paid to Mr. Bushman, separate and apart from his salary. Lockheed agreed to pay Mr. Bushman partial compensation of $300.00 for each invention for which Mr. Bushman applies for a patent and another $150.00 upon issuance of the patent.

4.5. Most importantly, the agreement calls for additional consideration to be paid to Mr. Bushman as follows:

*"1) To pay [Mr. Bushman] for each of the [his] inventions additional compensation, consisting of a percentage of any **income derived by [Lockheed] from any sale of rights in such invention** or part thereof, or from any royalties which [Lockheed] may collect from licenses to others, for the use of such inventions, . . . on a sliding scale as follows:*

*Of the first $1,000 or part thereof   30%*

> *Of the next $1,000 or part thereof*      25%
>
> *Of any further sums in excess of $2,000*      20%.

(emphasis added).

4.6. Thus, the payment obligation occurs in either of two instances when Lockheed has derived income:

     a. When that income is derived from a sale of any rights, including the right to use, a Bushman invention or improvement (hereafter referred to simply as "inventions"), and

     b. When that income is derived from royalties to Lockheed from licenses to others, for the use of such inventions.

The payments are required to be paid to Mr. Bushman "notwithstanding termination of [Mr. Bushman's] employment with [Lockheed]" and to Mr. Bushman's estate in the event of his death. Moreover, the income sharing provision is not dependent upon whether an invention is patented.

4.7. Based upon the agreement for compensation set out in the "Invention Agreement" and annual salary, Mr. Bushman agreed to commence work for General Dynamics, now Lockheed, in its Special Projects division.

### IN ORDER TO PERFORM HIS WORK, MR. BUSHMAN GAINS A SECURITY CLEARANCE

4.8. After commencing employment and after a six-month waiting period, Mr. Bushman obtained a security clearance from the United States Department of Defense ("DOD"), in particular, the Department of the Air Force. Security clearances are granted by the DOD directly to the individual, here, Mr. Bushman, only as a matter of privilege. It was necessary for Mr. Bushman to have a security clearance in order to have access to classified and other government documents so that he could fully discharge his job duties.

4.9. After Mr. Bushman obtained the security clearance, Lockheed gave him access to sensitive and classified government documents and materials. He then began developing inventions for Lockheed, and in particular for incorporation into Lockheed's aircraft. As a Senior Scientist, Mr. Bushman was not restricted to specific assignments by Lockheed, but was allowed to pursue experiments designed to test and develop inventions.

4.10. In order for Mr. Bushman to fully develop his research into new inventions, he needed an adequate laboratory to conduct experiments. The terms of the Invention Agreement continued to be a prime incentive for Mr. Bushman to develop his ideas and to profit from them. In fact, he sometimes would purchase materials on his own to bring to his workplace in order to furnish the lab with necessary items.

4.11. In 1993, Mr. Bushman was issued patents from the U.S. patent office for his initial inventions. According to the terms of the Invention Agreement, all patents issued in the name of Mr. Bushman were assigned to Lockheed. The primary inventions patented were for aircraft application and were related to the enhancement of warfare.

4.12. Mr. Bushman is the named inventor for in excess of twenty-six inventions that have been patented, and Lockheed is holding numerous other of Mr. Bushman's inventions that have not been submitted for patent. Mr. Bushman has been awarded more patents than any other scientist while he worked at Lockheed.

### LOCKHEED HAS NOT PAID BUSHMAN IN ACCORDANCE WITH THE INVENTION AGREEMENT

4.13. Since the inception of the Invention Agreement, Lockheed has made some, but very few payments to Mr. Bushman. At the same time, Lockheed has incorporated Mr. Bushman's inventions into its products and sold those products for billions of dollars. In addition, on information and belief, Lockheed has either licensed or sold Mr. Bushman's inventions to others (see, for example, paragraphs 4.19 and 4.20, below). In the process of submitting contracts to the DOD, Lockheed would have to agree that, if accepted, all inventions, either patented or not,

which are incorporated into the contract, would be the exclusive property of the DOD during the term of the contract, upon funding. Certain inventions that are covered by the Invention Agreement developed by Mr. Bushman were specifically funded by the DOD, and upon funding the DOD had the exclusive rights by purchase to those inventions. All records of contracts and payment are within the exclusive control of the Defendant. Some, but not all inventions funded by and thereby sold to the DOD, are known to Mr. Bushman. Those known to Mr. Bushman at this time are:

    a. Patent No. 5,543,917 - Detecting Targets by Digitizing Its Polarization;

    b. Patent No. 5,497,156 - Jet Exhaust Images Spoof Missiles from Decoy

    c. Patent No. 5,428,221 - Threat Warning System Using Plume Acoustispectrum Flame.

    d. Patent No. 5,452,089 - Target Signal Enhancement Using Polarized Emission.

    e. Patent No. 5,404,225 - Targets Detection Using a Liquid Crystal Retarder Warp III.

    f. Patent No. 5,345,308 - A Polarizer Is Rotated about the Axis of a Lense Array Warp II.

    g. Patent Number 5,264,916 - A Polarizer Is Rotated about the Axis of a Lense Array Warp I.

    h. The invention utilized in the production of inexpensive Electricity. Such invention is also incorporated in a US Patent which invention may come under a security restriction imposed by the DOD and, as such, the patent number will not be identified in this document.

Lockheed has gained development money from the DOD using Bushman inventions. The monies paid to Lockheed by the DOD were income that Lockheed derived from

the fact that Lockheed was selling the rights in the inventions to the DOD, which is Lockheed's only customer.

Lockheed has incorporated Mr. Bushman's inventions into its products and sold those products for billions of dollars. In this way, Lockheed has made sales of rights in Bushman's inventions – the sale of those products with the Bushman inventions incorporated constitutes "sale[s] of rights in such invention[s]" as defined by the Invention Agreement.[1]

Lockheed has not paid Mr. Bushman for the full amount of his 20% interest for the sales of rights in his inventions. Moreover, Lockheed currently is continuing to sell rights in Mr. Bushman's inventions by incorporating the inventions into its products.

### LOCKHEED VALUES IS TECHNOLOGIES GREATLY – IT THREATENS SUIT TO PROTECT A BUSHMAN INVENTION

4.14. In 1994, Lockheed learned that a combination of inventions known as "Soft" - Patent No. 5,680,135; "Flame" - Patent No. 5,428,221; and "PROW" - Patent No. 5,430,448 were being directly infringed upon by a Lockheed competitor. These technologies utilized heat radiation detection and the supersonic atmospheric shock wave in the RF and UV to detect oncoming missiles and aircraft.

4.15. Upon learning of the violation of the patent rights owned by Lockheed and Mr. Bushman, Lockheed commenced the process of securing a release from the security rules placed on the inventions by the DOD. On August 4, 1994 in a letter from Robert Knapp, AF LO/CLO OPR, Signature Technology Office, the patents were released from security restrictions to

"1. WL/XPN personnel have reviewed the information you submitted regarding

---

[1]This is fundamentally different than Lockheed's position that there was no transfer of patent rights. A patent only prevents the customer from reproducing the patented invention. It is not relevant to the rights that Lockheed sold, including the right to use the inventions or the right to further transfer the inventions as incorporated into the products. Bushman is not claiming that the patent rights were illegally sold. Moreover, the "inventions" as defined in the Invention Agreement, include but are not limited to patented inventions. In other words, the term" inventions" in the agreement is broader than the term "patent" as used in the agreement and refers to both patented <u>and</u> non-patented inventions and improvements.

**FIRST AMENDED COMPLAINT**                                                                                             Page 7

the PROW technologies and have determined that it did not meet the classification requirements of the AF LO/CLO security classification guide or other security guides applicable to that technology. Therefore, this information should be unclassified and Lockheed Fort Worth should be allowed to pursue patent litigation involving PROW technologies."

Lockheed hired an attorney to pursue the matter. Lockheed calculated its damages to be as high as One Hundred Million Dollars ($100,000,000.00).

4.16. Lockheed briefed Mr. Bushman on the potential litigation, which could have resulted in a sizeable payment to Mr. Bushman under the terms of his agreement with Lockheed. Although Mr. Bushman was prepared to support his patent by establishing his development of the invention, Lockheed made no efforts to go forward with the proposed infringement suit. Mr. Bushman believes that Lockheed settled or entered into a license with the infringers. Such payment would be income to Lockheed derived from a Bushman invention. Yet, Mr. Bushman has not been paid any money if that is the case.

### BUSHMAN, LOCKHEED, AND THE DEPARTMENT OF DEFENSE AGREE TO ALLOW LOCKHEED TO DEVELOP AN INDUSTRY OUT OF ONE PART OF A BUSHMAN INVENTION – INEXPENSIVE ELECTRICITY GENERATION

4.17. In 1995, Mr. Bushman patented part of an invention that initially was not classified by the DOD. This invention has two distinct applications as recognized by Mr. Bushman, Lockheed and the DOD. (For the purposes of this lawsuit, the important, and unclassified, application of the invention will be referred to as "inexpensive electricity generation"). The application of the invention to generate inexpensive electricity was not itself patented.

4.18. At that time, the management of Lockheed was led by vice president Charles Anderson. Mr. Bushman and Mr. Anderson had the desire to develop the inexpensive electricity generation invention and to develop a new industry for Lockheed. Lockheed even was exploring the possibility of establishing a separate division of the company.

4.19. To facilitate development, in 1995 Mr. Bushman and Mr. Anderson met with Air Force Lieutenant Colonel John Fagnunt, General McCloud, and Lieutenant Colonel Hinge at the Pentagon. All agreed that no classification restriction would be placed on the inexpensive electricity generation application of the invention, regardless of the classification of the invention itself or any portion or application of the invention

### LOCKHEED DIRECTS MR. BUSHMAN TO GIVE AN INTERVIEW TO *JANES DEFENCE WEEKLY*

4.20. In the early summer of 1998, the head of Lockheed's Public Relations Department, Joe Stout, told Mr. Bushman to give an interview to Mr. Nick Cook, editor of "*Janes Defence Weekly,*" (referred to simply as *Janes*) which is a military armament and weapons news reporting company located in England. Charles Anderson had retired from the company by then.

4.21. Lockheed was anxious for Mr. Bushman to give the interview. In fact, Larry McQueen, who was a patent attorney at Lockheed, directed Mr. Bushman to take several documents showing certain of Mr. Bushman's inventions and to discuss them. Those documents included documentation of the invention allowing for the inexpensive generation of electricity.

4.22. Lockheed told Mr. Bushman to use the interview as a means to raise interest in the inventions, which interest might lead to sales to Lockheed's customer -- the DOD. Prior to taking any documents to show *Janes*, Mr. Bushman showed them to and gained the approval for their release from at least Joe Stout and Jeff Fisher, who was in Lockheed's security department.

4.23. Lockheed was obligated to follows certain security guidelines and procedures that had been established by the DOD prior to allowing employees to give interviews. The protocols required that Lockheed contact the DOD at least three (3) weeks prior to the interview in order to gain the DOD's approval and to have internal security personnel present during the interview. Joe Stout is not in the security department at Lockheed, but it was his or his staff's responsibility to make sure that the protocols were followed.

4.24.   Neither Mr. Stout nor anyone else at Lockheed contacted the DOD in advance of the interview, nor did they provide a person from security to monitor the interview.

4.25.   Then, Mr. Bushman gave the interview without any knowledge that Lockheed had not followed proper procedures with the DOD. The interview was filmed and part was later seen on certain television stations in England and the United States.

### LOCKHEED ARRANGES A SECOND *JANES* INTERVIEW

4.26.   Several areas of discussion during the *Janes* interview, as well as the documents that Mr. Bushman was instructed by Lockheed to disclose, raised *Janes's* interest in a second interview of Mr. Bushman. *Janes* requested through Mr. Stout to have a second interview of Mr. Bushman and Lockheed directed Mr. Bushman to give the second interview.

4.27.   Prior to the second interview, the representative of *Janes* discussed with Mr. Bushman the various subject matters he wanted to cover, including inexpensive electricity generation. The inventions that Lockheed directed Mr. Bushman to talk about were not protected by patent or patent pending, including inexpensive electricity generation.

4.28.   Mr. Bushman discussed these subject matters with Lockheed personnel and expressed his concerns about the potential negative economic effect against himself and Lockheed if he were to disclose these inventions. Specifically, but not exclusively, Mr. Bushman expressed his concerns to Joe Stout.

4.29.   Mr. Bushman discussed with Lockheed that the best way to protect the inventions was to submit them for patent review so that they would at least obtain the status of "patent pending." Mr. Bushman was told that Lockheed was going to form a patent review committee. Nevertheless Lockheed dragged its feet and failed to assemble the patent review committee or to address the issues in any timely way. In an abundance of caution, Mr. Bushman submitted his invention of inexpensive generation of electricity for patent application.

4.30. The second *Janes* interview was conducted on April 26, 1999. Once again, Lockheed violated security guidelines by failing to gain the approval of the DOD for the interview and as to the subject matters and by failing to have a security person attend the interview. One of the matters discussed was the inexpensive generation of electricity and how it would be accomplished.

4.31. After this second *Janes* interview, Mr. Bushman continued in his efforts to protect the unpatented inventions. Mr. Bushman had an agreement with the *Janes* interviewer that he would be sent a proof copy to review and approve prior to publication. Mr. Bushman felt time was of the essence.

4.32. On May 12, 1999, Mr. Bushman contacted Joe Stout by phone and wrote a follow-up memo requesting that Lockheed establish the patent review committee. Because he did not know when the *Janes* interview would be ready for publication, Mr. Bushman was seeking to protect both his and Lockheed's rights in the inventions as expeditiously as possible.

4.33. Mr. Bushman advised Lockheed that the patent review committee should be established no later than May 29, 1999. Wayne McGregor, who was to head the committee, advised Mr. Bushman that the committee would be organized and would meet to review options.

4.34. The patent review committee eventually was formed from employees of Lockheed. The committee was to explore the manner in which to fast-track the application for patents of the unprotected inventions. The committee retained the services of a patent attorney and arrived at the decision that a patent application would provide sufficient protection if in place prior to publication of the *Janes* interview.

4.35. In October 1999, *Janes* sent the article to Lockheed for review. Lockheed provided Mr. Bushman a copy that he then edited. However, the issues regarding the protection of the inventions still were not resolved. Lockheed reached an agreement with *Janes* that, if Mr. Bushman agreed, *Janes* would withhold publication of the article. Mr. Bushman confirmed his

agreement with *Janes* not to publish, and the article remains unpublished.

4.36.   The DOD obtained a copy of the article. As a result, and with no opportunity given to Mr. Bushman to respond, on December 27th, 1999 the DOD sent Mr. Bushman a letter advising him that his access to special access programs was being restricted. The reason for the restriction was that Mr. Bushman has made the "offense of failing to follow established security procedures." Of course, that completely limited Mr. Bushman's ability to work on his ongoing special access programs. Then on January 24, 2000, Lockheed's internal security department issued a notice of security violation to Mr. Bushman.

4.37.   Mr. Bushman made efforts to regain his special access. He caused Lockheed officials to investigate the facts and issues surrounding the special access revocation. He had discussions at least with the head of security, Buddy Wright, and Robert Robbins about the circumstances surrounding the *Janes* interviews, and he wrote a memo to Jeff Fisher in the Security and Emergency Services department explaining that no security or classification concerns had been expressed to him by Lockheed and that Lockheed had not marked any of the documents used in the interview as classified. Lockheed discovered and was aware that it was Joe Stout who had arranged the interviews and that it was Stout's responsibility to notify the DOD and gain its pre-approval.

4.38.   At the suggestion of Charles Anderson as well as the head of security, Buddy Wright, and with the support of Robert Robbins, Mr. Bushman then wrote to Dain Hancock, president of Lockheed, and requested that Lockheed send the DOD a "letter of compelling need." Such a letter would request that the DOD allow Mr. Bushman access to the special projects information so that he could continue his work.

4.39.   This same process had been used by Lockheed for others in order to regain DOD clearance to projects and information. Nevertheless, On February 18, 2000, Ralph Heath, executive vice president of Lockheed responded to Mr. Bushman stating that Lockheed would not

send a special needs letter to the DOD. Thus, once confronted with the facts of its investigation, rather than clarify and remedy the problem it caused Mr. Bushman with the DOD, Lockheed chose to blame everything on Mr. Bushman.

4.40. On information and belief, several people at Lockheed decided that it was in Lockheed's interest to make Mr. Bushman the "fall guy" in its and the DOD's investigation into the matter so that they would not come under DOD scrutiny and punishment -- those people were at least Don Jones, Cheryl Wise, Rod Cusic, Dain Hancock, Ralph Heath, and Joe Stout.

4.41. Then Lockheed told Mr. Bushman that because of his loss of his special access, he was no longer part of Lockheed's future. Lockheed informed Mr. Bushman he was going to be laid off as of May 1, 2000. On information and belief, Lockheed understood that if it were to terminate Mr. Bushman, all DOD investigation of the matter would stop and that no blame would be assessed to Lockheed itself. Lockheed insisted that Mr. Bushman sign a release agreement that would have Mr. Bushman waive all of his legal rights against Lockheed. Faced with being terminated with no benefits, Mr. Bushman was forced to take early retirement.

### LOCKHEED'S ACTIONS HAVE DESTROYED MR. BUSHMAN'S JOB OPPORTUNITIES

4.42. Mr. Bushman has made diligent efforts to secure employment since his forced retirement. However, on information and belief, Lockheed has prevented Mr. Bushman from securing a new position by advising potential employers of matters designed to cast Mr. Bushman in an unfavorable light, namely the security violation. Consequently, Mr. Bushman has been unemployed since April 2000.

4.43. Mr. Bushman's lack of a current security clearance has prevented him from gaining employment in his profession. The only way that Mr. Bushman could clear his name and regain his clearance would be to file an appeal with the DOD. Nevertheless, Mr. Bushman cannot do that without the appeal being made or sponsored by Lockheed. Because Lockheed has decided not to sponsor the appeal, Mr. Bushman finds himself without a way to regain his clearance.

## 5. CAUSES OF ACTION

5.1. Mr. Bushman incorporates into all of the causes of action the factual allegations contained above as if fully set forth in each individual cause of action.

**Count 1 -    Breach of Contract and Attorneys Fees**

5.2. Lockheed entered into an enforceable contract with Mr. Bushman as set forth in the Invention Agreement. The Invention Agreement was drafted by Lockheed predecessor, General Dynamics. To the extent that there is any ambiguity in the contract, that ambiguity must be construed against Lockheed.

5.3. The contract terms used by Lockheed in the Invention Agreement are expressed in the broadest meaning. Lockheed agreed to pay Mr. Bushman a portion of any income it derived from sales of <u>any</u> rights related to any of Mr. Bushman's inventions. In addition, Lockheed agreed to pay Mr. Bushman a percentage of any income derived by [Lockheed] . . . from any royalties from licenses to others, for the use of such inventions.

5.4. Lockheed has periodically paid Mr. Bushman very small amounts of money under the Invention Agreement, but those amounts are insignificant. Conversely, Lockheed has sold rights in Mr. Bushman's inventions, including but not limited to the right to use the inventions as incorporated into Lockheed's products. In fact, many of Lockheed's sales of fighter jets have been made as the result of inventions by Mr. Bushman, which inventions have made the jets more attractive to buy than competing products because they are technologically superior.

5.5. The sale of these products and the rights to income asserted by Mr. Bushman are based on the actual sales price to the purchaser from Lockheed. Mr. Bushman's inventions, protected by patent, have been sold and income has been derived by Lockheed. Mr. Bushman claims his percentage of income to all those patented inventions set out in paragraph 4.13 to which exclusive rights were sold under contract by Lockheed to the DOD. Mr. Bushman claims his right to income for all similar sales of his technologies which may be revealed upon future

discovery.

5.6   Lockheed has made income in the multiples of billions of dollars and, in particular, income related to the actual sale of the exclusive rights to his patented inventions of several million dollars, but has not paid Mr. Bushman the full amounts due him under the Invention Agreement. Lockheed's failure to pay constitutes a breach of contract.

5.7.   In addition, when Lockheed has been paid development money by the DOD because of inventions by Bushman, the payments are income to Lockheed. Rights in the inventions were sold to the DOD, which became the owner of the inventions through the development funding.

5.8.   The Invention Agreement obligates Lockheed to pay Mr. Bushman a range of percentages of its income derived from transfers of rights of Mr. Bushman's inventions. Lockheed has paid Mr. Bushman extraordinarily less than the Inventions Agreement calls for. The amount of non-payment constitutes damages to Mr. Bushman that cannot precisely be valued until Lockheed has disclosed its income in discovery in this case. The books and accounting records related to all income made by Lockheed and derived from any of Mr. Bushman's inventions are exclusively in the possession of Lockheed. Mr. Bushman certainly does not have access to those accounting records. Mr. Bushman believes his damages may be more than one billion dollars. Mr. Bushman sues for the full amount of damages owed as a result of Lockheed's breach as well as for interest and costs.

5.9.   Mr. Bushman has been forced to hire attorneys to pursue his rights under the contract. In accordance with the Texas Civil Practice and Remedies Code, Mr. Bushman seeks reasonable attorney's fees in the amount of $300.00 per hour.

### Count 2 – Negligence – against all Defendants

5.10.   Lockheed was required to follow the DOD security guidelines that were designed to protect against the release of classified or otherwise sensitive information. These procedures

included the requirement that it obtain the DOD approval for any employee interviews by outside parties. In addition, Lockheed was mandated to have security personnel appear at any such interview in order to protect against disclosure of sensitive material that the interviewee might inadvertently make.

5.11. Joe Stout arranged for Mr. Bushman to be interviewed by *Jane's Defence Weekly*. Stout specifically directed Mr. Bushman to appear to be interviewed, and Lockheed lawyer McQueen directed Mr. Bushman to make attempts to generate interest in his inventions so that Lockheed might profit.

5.12. Neither Stout nor anyone else at Lockheed contacted the DOD to gain approval of the fact of or subject matters of the interviews, not even Jeff Fisher in security. And they failed to send a security person to the interviews given by Mr. Bushman. If Lockheed had followed the mandated procedures, Mr. Bushman would not have become investigated by the DOD. The information released by Mr. Bushman was not classified; nevertheless, failing to follow its procedures, Lockheed caused the investigation to occur and the concomitant special projects access restriction to be issued by the DOD.

5.13. It is a necessary element of Mr. Bushman's career that he have a DOD clearance to review classified government materials. The right and privilege granted by the DOD is granted to Mr. Bushman directly, not Lockheed. Lockheed had a general duty to Bushman not to do anything that would interfere with his personal rights and privileges between Mr. Bushman and the third party DOD.

5.14 Yet neither Stout not anyone else at Lockheed made any effort to follow the security guidelines mandated by the DOD nor made any effort to protect Mr. Bushman's special access security clearance. Lockheed breached its duty to Mr. Bushman when it failed to follow security guidelines that Lockheed knew or should have known would cause interference and termination of Mr. Bushman's DOD clearance.

5.15   Upon Mr. Bushman reporting to Lockheed that his special access privilege was revoked by the DOD, Lockheed undertook to investigate why that had occurred. It found that the fault lied with at least Joe Stout, who had failed to follow know security mandates. Lockheed was then concerned that disclosure of the investigation to the DOD would cause the DOD to reprimand Lockheed rather than just Mr. Bushman. Lockheed knew that if it refused to assist Mr. Bushman to clarify the situation with the DOD, and if it were to terminate Mr. Bushman's employment, the DOD's own investigation would cease.

5.16.   Instead, Lockheed, Stout and others, chose to make Mr. Bushman the scapegoat. Lockheed took no responsibility for its failure to follow DOD guidelines, and its actions and inactions constitute a breach of their duty not to interfere with Mr. Bushman's security clearance. Under the circumstances, Lockheed had a further duty to speak to the DOD to clarify that it was Lockheed's fault that DOD security guidelines were not followed.

5.17.   The result of Lockheed's breach of its duties was that the DOD revoked Mr. Bushman's special access security clearance to the very material that he needed to perform his job. Lockheed then refused to send a letter of compelling need to the DOD so that Mr. Bushman could once again perform his job duties.

5.18.   Lockheed's lack of cooperation in the investigation of the alleged security violation has included Lockheed's refusal to sponsor Mr. Bushman's appeal of the clearance revocation with the DOD. Without that support, Mr. Bushman cannot pursue the appeal.

5.19.   Lockheed used Mr. Bushman's precarious status to issue an internal security violation notice to him and then to notify him he was being laid off because of a lack of work for him. Lockheed intended that the DOD investigation would not uncover its ineptitude and lax security if Mr. Bushman were terminated.

5.20.   Lockheed's actions and inactions have proximately caused Mr. Bushman to lose his security clearance and not to be able to gain further employment as a scientist. In short,

Lockheed ruined Mr. Bushman's career in order to make itself and it officers appear blameless. It made Mr. Bushman the fall guy for Lockheed's own violations of DOD security guidelines.

5.21. Mr. Bushman has been damaged at least by the loss of income resulting from his inability to gain employment. Mr. Bushman sues for those damages and costs and interest on account of the Defendants' negligent conduct.

5.22. The actions of Lockheed were willful, wanton, intentional, without justification or excuse, were malicious and done with gross indifference to the rights of Mr. Bushman. Accordingly, Mr. Bushman would show that he is entitled to recover exemplary damages from Lockheed.

## 6. CONCLUSION

6.1. WHEREFORE, PREMISES CONSIDERED, Mr. Bushman prays that upon final hearing or trial, he have judgment against the Defendants as follows:

I. Judgment against Lockheed for actual damages for its breach of the Invention Agreement;

II. Judgment against Lockheed for actual damages arising from its negligence;

III. Judgment against Lockheed for exemplary damages in an amount as determined by the trier of fact;

IV. Judgment against Lockheed for attorneys' fees;

V. Pre-judgment and post-judgment interest as provided by law;

VI. Court costs;

VII. For such other and further relief, both general and special, at law or in equity, to which Plaintiff may show himself justly entitled.

Respectfully submitted,

*[signature]*

**COLLIN D. PORTERFIELD**
SBN: 16159900
14850 Montfort Drive
Suite 220, LB-12
Dallas TX 75254
(972) 960-2600
(972) 239-6696 Facsimile

**B. Buzz Deitchman, Esq.**
SBN: 05720500
14850 Montfort Drive
Suite 220, LB-12
Dallas TX 75254
(972) 960-2600
(972) 239-6696 Facsimile

**ATTORNEYS FOR PLAINTIFF**

### CERTIFICATE OF SERVICE

I certify that on October 19, 2001, I caused a copy of this pleading to be served upon counsel for Defendant, Lockheed Corporation.

*[signature]*
~~B. Buzz Deitchman~~, Esq.
Collin D. Porter Field

## DEPARTMENT OF THE AIR FORCE
WRIGHT LABORATORY (AFMC)
WRIGHT-PATTERSON AIR FORCE BASE, OHIO

4 August 1994

MEMORANDUM FOR LOCKHEED FORT WORTH
          ATTENTION: S. KEITH JACKSON

FROM:  WL/XPN

SUBJECT:  Release of PROW Technologies from Security Controls
          (your message, 28 June 1994)

1. WL/XPN personnel have reviewed the information you submitted regarding the PROW technologies and have determined that it did not meet the classification requirements of the AF LO/CLO security classification guide or other security guides applicable to that technology. Therefore this information should be unclassified and Lockheed Fort Worth should be allowed to pursue patent litigation involving PROW technologies.

2. This office will recommend to SAF/AQL that the Secrecy Order be removed from your patent.

ROBERT KNAPP
AF LO/CLO OPR
Signature Technology Office